IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SONYA LIA VILAR
f/k/a SONYA LIA SAAVEDRA,

       Plaintiff,

vs.                                       No. CIV 14-0226 JB/KBM

EQUIFAX INFORMATION SERVICES,
LLC; TRANSUNION, LLC; EXPERIAN
INFORMATION SOLUTIONS, INC.;
CHASE HOME FINANCE, LLC; LCS
FINANCIAL SERVICES CORP.; RCS
RECOVERY SERVICES, INC.; and REAL
TIME RESOLUTIONS, INC.,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on JPMorgan Chase Bank, N.A.'s Motion to

Dismiss for Failure to State a Claim, filed July 14, 2014 (Doc. 62)("MTD").  The Court held a

hearing on November 13, 2014.  The primary issues are: (i) whether Defendant JPMorgan Chase

Bank, N.A. ("JPMorgan Chase")[1] willfully violated § 1681s-2(a)(2) of the Fair Credit Reporting

Act, 15 U.S.C. § 1681, et seq. ("FCRA"); (ii) whether JPMorgan Chase negligently violated

§ 1681i of the FCRA; (iii) whether JPMorgan Chase engaged in unfair, deceptive, and

unconscionable trade practices in violation of § 57-12-2 of the New Mexico Unfair and

Deceptive Trade Practices Act, N.M. Stat. Ann. §§ 57-12-1 to 57-12-26 ("UPA"); and

(iv)  whether JPMorgan Chase violated § 1692e(2)(A) of the Fair Debt Collection Practices Act,

---

[1]JPMorgan Chase is the successor in interest to Defendant Chase Home Finance, LLC by virtue of a successful merger of Chase Finance into JPMorgan effective on or around May 1, 2011.  <u>See</u> MTD at 1.  Accordingly, where the Amended Complaint refers to "Chase Home Finance, LLC," the Court will instead use "JPMorgan Chase."

15 U.S.C. § 1692-1692p ("FDCPA").  The Court will grant the MTD.  First, Vilar cannot plausibly allege that JPMorgan willfully violated § 1681s-2a of the FCRA, because that section does not give rise to a private cause of action.  Moreover, even if § 1681s-2a gave rise to a private cause of action, Vilar does not plausibly allege that JPMorgan Chase reported inaccurate information to any credit reporting agencies ("CRAs").  Second, Vilar cannot plausibly allege that JPMorgan Chase negligently violated § 1681i of the FCRA, because JPMorgan Chase is not a CRA and is, therefore, not subject to § 1681i's requirements.  Third, Vilar does not plausibly allege that JPMorgan Chase violated § 57-12-2 of the UPA, because the UPA does not require lenders to disclose all helpful information, but instead prohibits them from disseminating misleading, deceitful, or false information; Vilar attempts to turn the UPA into a full-disclosure statute, when it is not.  Similarly, Vilar's contention that JPMorgan Chase violated the UPA by misrepresenting that it owned the Second Mortgage when it accepted the short-sale's proceeds is, at this time, implausible.  Fourth, Vilar does not plausibly allege that JPMorgan Chase violated either § 1692g(a) or § 1692e(2)(a) of the FDCPA, because it is not a "debt collector," and is, therefore, not subject to the FDCPA.

## FACTUAL BACKGROUND

The Court takes its facts from the Amended Complaint, filed June 26, 2014 (Doc. 51)("Amended Complaint"), as it must when considering a motion to dismiss for failure to state a claim.  See Fed. R. Civ. P. 12(b)(6).  In June, 2007, Vilar purchased the property at 501 14th St. N.W., Albuquerque, New Mexico, 87112 ("the Property").  Amended Complaint ¶ 12, at 3.  Vilar executed a promissory note[2] ("First Note") and mortgage[3] ("First Mortgage") on the

---

[2]A promissory note is a "financial instrument . . . in which one party . . . promises in writing to pay a determinate sum of money to the other, either at a fixed or determinable future

Property with First Franklin Financial Corporation for $160,000.00.  Amended Complaint ¶ 12, at 3.  That same day, Vilar executed a second promissory note ("Second Note") and a second mortgage ("Second Mortgage") on the Property with First Franklin for $40,000.00.  Amended Complaint ¶ 12, at 3.  Three or four months later, First Franklin transferred Vilar's mortgages to JPMorgan Chase.  See Amended Complaint ¶ 13, at 4.

Vilar was and is a self-employed insurance broker who suffered a significant decrease in income because of the 2008 recession.  See Amended Complaint ¶ 14, at 4.  Although Vilar tried multiple times to work with JPMorgan Chase to modify her loan payments, JPMorgan Chase refused all options but short selling[4] the Property or foreclosing[5] on it.  See Amended Complaint

---

time or on demand of the payee, under specific terms."  Promissory Note, Wikipedia.org, http://en.wikipedia.org/wiki/Promissory_note (last visited Dec. 10, 2014).

    [3]A mortgage

    occurs when an owner (usually of a fee simple interest in realty) pledges his or her interest (right to the property) as security or collateral for a loan.  Therefore, a mortgage is an encumbrance (limitation) on the right to the property just as an easement would be, but because most mortgages occur as a condition for new loan money, the word mortgage has become the generic term for a loan secured by such real property.

Mortgage Loan, Wikipedia.org, http://en.wikipedia.org/wiki/Mortgage_loan (last visited Dec. 10, 2014).  The Amended Complaint never defines "mortgage," but instead uses it to refer to: (i) the loans that Vilar received from First Franklin in June, 2007, that First Franklin later transferred to JPMorgan Chase; (ii) JPMorgan Chase's interest in the Property that secured those loans; or (iii) both (i) and (ii) together.  Consequently, where it is clear in the Amended Complaint how Vilar is using the word "mortgage," the Court will explain which form of "mortgage" Vilar is using.  Where it is unclear, however, the Court will quote directly from the Amended Complaint to ensure that it is accurately portraying the facts as the Amended Complaint alleges them.  Where it is necessary to the Court's resolution of the MTD, the Court will resolve these ambiguities in its analysis.

    [4]A short sale is

    a sale of real estate in which the proceeds from selling the property will fall short of the balance of debts secured by liens against the property, and the property owner cannot afford to repay the liens' full amounts and where the lien holders

¶ 14 at 4.  By January, 2009, Vilar was delinquent on the Second Mortgage.  See Amended Complaint ¶ 14, at 4.  To minimize the damage to her credit score, Vilar marketed the Property -- with JPMorgan Chase's consent -- as a short sale.  See Amended Complaint ¶ 15, at 4.

In December, 2010, JPMorgan Chase charged off[6] Vilar's Second Mortgage and wrote off[7] its total balance of $39,603.00.  See Amended Complaint ¶ 16, at 4.  JPMorgan Chase also

---

agree to release their lien on the real estate . . . .

Short Sale, Wikipedia.org, http://en.wikipedia.org/wiki/Short_sale_%28real_estate%29 (last visited Dec. 10, 2014).

[5]A foreclosure is a "legal process in which a lender attempts to recover the balance of a loan from a borrower who has stopped making payments to the lender by forcing the sale of the asset used as the collateral for the loan." Foreclosure, Wikipedia.org, http://en.wikipedia.org/wiki/Foreclosure (last visited Dec. 10, 2014).

[6]A charge off is

a declaration by a creditor . . . that an amount is unlikely to be collected.  This occurs when a consumer becomes severely delinquent on a debt.  Traditionally, creditors will make this declaration at the point of six months without payment.

. . . .

While a charge-off is considered to be "written off as uncollectable" by the bank, the debt is still legally valid, and remains as such after the fact. The creditor has the right to legally collect the full amount for the time periods permitted by the statutes of limitation based on the location of the bank and where the consumer resides.  Depending on the location, this amount of time may be a certain number of years (e.g., 3 to 7 years), or in some places, indefinitely.

Charge-Off, Wikipedia.org, http://en.wikipedia.org/wiki/Charge-off (last visited Dec. 10, 2014)(emphasis added).

[7]A write off is "the same as a charge off" and is

used when a financial institution takes an account from a ledger and posts it to that financial company's "unable to collect" ledger. The lien from the mortgage still exists on the property owner/debtor's credit report. The monies owed at the time of the "charge off" are still owed.  The financial company is simply waiting to decide its next move. It is simply not going to continue trying to collect on a loan that the debtor is unwilling or unable to pay.  The fallacy believed by too

began notifying credit-reporting agencies that the Second Mortgage had been "[t]ransferred to

recovery."  Amended Complaint ¶ 16, at 4 (internal quotation marks omitted).  JPMorgan Chase

never informed Vilar, however, that it had charged off the Second Mortgage and transferred it to

a collections agency.  See Amended Complaint ¶ 16, at 4; id. ¶ 24B, at 6.

On January 18, 2011, Vilar accepted an offer to purchase the Property as a short sale for

$104,880.58.  See Amended Complaint ¶ 17, at 4.  On February 1, 2011, JPMorgan Chase

approved the short sale in a letter that stated, in pertinent part:

> Dear Mortgagor(s):
>
> Chase Home Finance LLC ("Chase") has agreed to your request for a
> Short Sale, and will accept a minimum of $104,880.58 to release the lien(s) on the
> above-referenced Property.
>
> **Please note this amount is for the release of the lien(s) only and that
> you are responsible for all deficiency balances per the terms of the original
> loan documents.**
>
> . . . .
>
> Once certified funds have been received, Chase will release the lien(s).
> Any excess funds at closing will be paid to Chase.  As the Seller, you will not
> receive any proceeds from this transaction.

Letter at 1-2 from JPMorgan Chase to Tracy Von Blon[8] (Feb. 1, 2011), filed June 26, 2014 (Doc.

51-1)("Letter")(bold in original).[9]

---

many debtors is that they no longer owe anything on this "charged off" mortgage.

Writing Off or "Charging Off" Your Second Mortgage & Putting it into Bankruptcy,
TheLawDictionary.org, http://thelawdictionary.org/article/writing-off-or-charging-off-your-
second-mortgage-putting-it-into-bankruptcy/ (last visited Dec. 14, 2014).

[8]Tracy Von Blon was Vilar's realtor at all times relevant to the Amended Complaint.

[9]Because the Amended Complaint incorporates the Letter by reference, the Court will
consider it in deciding the MTD.  The United States Court of Appeals for the Tenth Circuit has
explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential
evidence that the parties might present at trial, but to assess whether the plaintiff's complaint
alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State

The loan numbers for both the First Mortgage and the Second Mortgage were "clearly typed on top of each page" of the short-sale purchase agreement.  Amended Complaint ¶ 20, at 4 (citing Realtor's® Association of New Mexico Purchase Agreement - Residential Resale - 2011 at 1, filed June 26, 2014 (Doc. 51-1)("Purchase Agreement")).  When the short sale closed on February 28, 2011, $105,355.58 was wired to JPMorgan Chase to "[p]ayoff first mortgage . . . short sale payoff loan 24723025 . . . ."  Amended Complaint ¶ 21, at 5 (quoting Outgoing Wire Form at 1, filed June 26, 2014 (Doc. 51-1)("Wire Transfer")).  Loan # 24723025 was the Second Mortgage.  See Amended Complaint ¶ 21, at 5.

JPMorgan Chase has never released[10] either the First Mortgage or the Second Mortgage.  See Amended Complaint ¶ 22, at 5.  Mortgage Electronic Registration Systems, Inc. ("MERS")

---

Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Vilar attached the Letter from JPMorgan Chase to Tracy Von Blon (Feb. 1, 2011), filed June 26, 2014 (Doc. 51-1); the Realtor's® Association of New Mexico Purchase Agreement - Residential Resale - 2011 at 1, filed June 26, 2014 (Doc. 51-1); the Outgoing Wire Form at 1, filed June 26, 2014 (Doc. 51-1); the Release of Mortgage for Loan # 0024723025 (Apr. 3, 2011), filed June 26, 2014 (Doc. 51-1); and the Release of Mortgage for Loan # 0024722837 (Mar. 30, 2011), filed June 26, 2014 (Doc. 51-1) to the Amended Complaint and incorporated them into the Amended Complaint by reference.  Consequently, the Court will consider all of these documents in deciding the MTD.

[10]A release is when

the holder of a lien, or security interest in a piece of property, lifts or waives the lien, rendering the property free to purchase.  A mortgage is the most common type of lien and represents the security interest the bank has in the real property. If you plan on selling a piece of real estate with a mortgage, the bank that holds your lien must be involved in the transaction to make sure that the lien is released or transferred before the transaction can take place. If this does not happen and money is not repaid to the bank to service the debt, the bank can legally take possession of the house or prevent the sale of the property. When the lien release

recorded, however, two Releases of Mortgage with the Clerk of the County of Bernalillo, New Mexico, for those mortgages.  See Amended Complaint ¶ 23, at 5 (citing Release of Mortgage for Loan # 0024723025 (Apr. 3, 2011), filed June 26, 2014 (Doc. 51-1)("First Release"); Release of Mortgage for Loan # 0024722837 (Mar. 30, 2011), filed June 26, 2014 (Doc. 51-1)("Second Release")).

In August, 2012, Vilar began receiving letters from Defendants LCS Financial Services Corporation and Real Time Resolutions, Inc., which said that the Second Mortgage was an active debt in collections.  See Amended Complaint ¶ 24, at 5.  Vilar subsequently obtained copies of her credit reports and discovered that JPMorgan Chase and First Franklin were reporting that she still owed the full amount on the Second Mortgage.  See Amended Complaint ¶ 24, at 5.  After the short sale, JPMorgan Chase did not inform her: (i) that the short sale did not apply to both the First Mortgage and the Second Mortgage; (ii) that she was still liable for the amount owed on the Second Mortgage; (iii) what the remaining balance on the Second Mortgage was after the short sale; (iv) that she should continue making the same monthly payments; or (v) that she had a right to dispute the debt.  See Amended Complaint ¶ 24A, at 5.  Moreover, JPMorgan Chase did not send Vilar a bill for the Second Mortgage's monthly payments after the short sale.  See Amended Complaint ¶ 24A, at 5.

Vilar began disputing her negative entries with CRAs, JPMorgan Chase, LCS Financial, and Real Time, but was unsuccessful in removing the entries from her credit report.  See Amended Complaint ¶ 25, at 6.  Although JPMorgan Chase had stopped reporting Vilar's

---

is signed, the bank acknowledges that it no longer has any claims on the real estate.

What Is A Lien Release?  TheLawDictionary.org,  http://thelawdictionary.org/article/what-is-a-lien-release/ (last visited Dec. 14, 2014).

delinquency on the Second Mortgage to the credit-reporting agencies in December, 2010, it began to do so again in February, 2012, and continued to do so until April, 2013.  See Amended Complaint ¶ 28, at 6.

From November, 2012, through fall 2013, Vilar disputed the negative entries on her credit reports with Defendants Experian Information Solutions, Inc., Equifax Information Solutions, Inc., and TransUnion, LLC -- all of which refused to remove the entries from her reports.  See Amended Complaint ¶ 25, at 6.  In the summer of 2013, Vilar began receiving letters from a new collection agency -- RCS Recovery Services, Inc. -- regarding the Second Mortgage.  See Amended Complaint ¶ 26, at 6.  RCS Recovery Services, LCS Financial, and Real Time all claim that Vilar owes a balance of $39,603.00 on the Second Mortgage.  See Amended Complaint ¶ 26, at 6.  Experian Information, Equifax Information, and TransUnion "have not verified these entries as accurate, and thus have not corrected [them]."  Amended Complaint ¶ 29, at 7.

In September, 2013, Vilar attempted to refinance her personal residence, but was denied because of the negative entries in her credit reports.  See Amended Complaint ¶ 27, at 6.  Unless Vilar pays off the Second Mortgage, the negative entries will remain on her credit reports until at least February, 2017, and potentially until August, 2019.[11]  See Amended Complaint ¶¶ 30, 32,

---

[11]The Amended Complaint states:

> According to information contained on Plaintiff's credit reports from the three credit reporting agencies, this debt will remain on Plaintiff's credit until February 2017, when the reporting period on this debt expires in July, 2015. . . .  RCS reports that, unless the debt is paid, it will continue to report Plaintiff's second mortgage until August 2019, when the reporting period expires in July, 2015.

Complaint ¶¶ 30, 32, at 7.  Although the Court is unsure why RCS Recovery would continue to report Vilar's second mortgage two years after the other credit reporting agencies, the Court concludes that providing this date range is the best way to represent the Complaint's allegations.

at 7.

## **PROCEDURAL BACKGROUND**

Vilar commenced this lawsuit on March 8, 2014. See Complaint, filed March 8, 2014 (Doc. 1)("Complaint"). She filed the Amended Complaint on June 26, 2014. See Amended Complaint at 1. The Amended Complaint alleges, among other things, that JPMorgan Chase: (i) willfully violated §§ 1681s-2(a)(1) and 1681s-2(a)(2) of the FCRA, see Amended Complaint ¶¶ 38-42, at 8-9 ("Count II"); (ii) negligently violated § 1681i of the FCRA, see Amended Complaint ¶¶ 50-55, at 10-11 ("Count IV"); (iii) engaged in unfair, deceptive, and unconscionable trade practices, in violation of § 57-12-2 of the UPA, see Amended Complaint ¶¶ 67-70, at 13-14 ("Count VII"); and (iv) violated §§ 1692g(a) and 1692e(2)(A) of the FDCPA, see Amended Complaint ¶¶ 71-76, at 14-15 ("Count VIII").

First, Vilar contends that JPMorgan Chase willfully violated §§ 1681s-2(a)(1) and 1681s-2(a)(2) of the FCRA. See Complaint ¶¶ 39-41, at 8-9. Vilar asserts that she complied with §§ 1681c(f) and 1681h of the FCRA by disputing the erroneous entries in her credit history, and by providing JPMorgan Chase with sufficient information and documentation to reasonably believe that its negative reports to the CRAs since July, 2010, were inaccurate. See Complaint ¶ 39, at 8. Vilar argues that JPMorgan Chase violated § 1681s-2(a)(1) by filing negative reports with the CRAs regarding the Second Mortgage, despite having actual knowledge, or reasonable cause to believe, that the negative reports were inaccurate. See Complaint ¶ 40, at 8-9. Vilar asserts that, moreover, JPMorgan Chase has failed to correct and update the negative reports that it submitted to the CRAs, despite having actual knowledge, or reasonable cause to believe, that the information it reported was inaccurate, in violation of § 1861s-2(a)(2). See Complaint ¶ 41, at 8-9.

Second, Vilar alleges that JPMorgan Chase negligently violated § 1681i of the FCRA. See Complaint ¶¶ 50-55, at 13-14. Vilar asserts that, once she disputed the erroneous entries in her credit history, JPMorgan Chase had a duty under § 1681i to report that dispute to the CRAs and to inform Vilar of the results of the CRAs' investigations of that dispute. See Complaint ¶ 52, at 10. Vilar contends that JPMorgan Chase breached that duty when it: (i) did not turn over all of the information that Vilar had given JPMorgan Chase regarding the Second Mortgage to the CRAs; and (ii) repeatedly attempted to overlook the errors in Vilar's credit reports regarding the Second Mortgage to get her to pay, disregarding that it had already accepted partial payment of the Second Mortgage as payment in full. See Complaint ¶ 54, at 11.

Third, Vilar argues that JPMorgan Chase engaged in unfair, deceptive, and unconscionable trade practices, in violation of § 57-12-2 of the UPA. See Complaint ¶¶ 67-70, at 13-14. Vilar states that JPMorgan Chase: (i) charged-off and sold the Second Mortgage to a collection agency, and then, two months later, negotiated and accepted payment from a short sale on the same mortgage; (ii) disregarded that First Franklin had recorded releases of both the First Mortgage and the Second Mortgage; (iii) began reporting Vilar's delinquency on the Second Mortgage after not reporting on it for over a year, and continued to report on it for fourteen months; and (iv) continued to verify Vilar's delinquency on the Second Mortgage every time Vilar filed a dispute, despite no longer owning the debt. See Complaint ¶¶ 68A-D, at 13. Vilar contends that, by engaging in these acts, JPMorgan Chase took advantage of her lack of knowledge, ability, and experience to a grossly unfair degree. See Complaint ¶ 69, at 13.

Finally, Vilar contends that JPMorgan Chase violated §§ 1692g(a) and 1692e(2)(A) of the FDCPA. See Complaint ¶¶ 71-76, at 14-15. Vilar asserts that JPMorgan Chase violated § 1692g(a) when it never told her: (i) that she owed payments on the Second Mortgage; (ii) the

balance that she owed on the Second Mortgage; (iii) the amount in arrears; (iv) the date that her payments were due; (v) where she should send the payments; or (vi) that she could dispute that she still owed payments on the Second Mortgage.  See Complaint ¶¶ 72, 72A[12] at 14.  Vilar also argues that JPMorgan Chase violated § 1692e(2)(A) when it falsely, deceptively, and in a misleading manner, represented that she should make payments on the Second Mortgage to JPMorgan Chase, despite the fact that JPMorgan Chase had sold the mortgage to a collection agency.  See Complaint ¶ 74, at 14.  Vilar points out that JPMorgan Chase did this knowing that the short-sale closing documents reflected that it had paid off both the First Mortgage and the Second Mortgage.  See Complaint ¶ 76, at 14.

      1.    **MTD.**

JPMorgan Chase filed the MTD on July 14, 2014.  See MTD at 1.  In the MTD, JPMorgan Chase asks the Court to dismiss all of Vilar's claims against JPMorgan Chase.  See MTD at 6-14.  JPMorgan Chase first addresses Vilar's claim that it violated §§ 1681s-2(a)(1) and 1681s-2(a)(2) of the FCRA.  See MTD at 6-9.  JPMorgan Chase points out that § 1681s-2(a)(1)(A)(B) states that a violation of the FCRA occurs only if the information provided to a consumer reporting agency is "inaccurate."  MTD at 6.  JPMorgan Chase contends that it has not violated the FCRA, because it was and is accurately reporting Vilar's unreleased, valid debt to consumer credit agencies.  See MTD at 6.  JPMorgan Chase asserts that all of Vilar's allegations are premised on a false assumption: a release of a mortgage automatically releases the underlying debt which the mortgage secures.  See MTD at 6-7.  JPMorgan Chase points out that, in fact, the opposite is true.  See MTD at 7.  According to JPMorgan Chase, New Mexico courts have

---

[12]Because the Complaint has two paragraphs in a row numbered "72" -- which the Court assumes is a typographical error -- the Court will cite the second paragraph 72 as "72A" and the Complaint's remaining paragraphs as if they were properly numbered.

consistently recognized that "a lender may release only the mortgage security interest and still pursue the underlying debt."  MTD at 7 (citing <u>Sunwest Bank of Clovis, N.A. v. Garrett</u>, 1992-NMSC-002, ¶ 11, 823 P.2d 912, 915 (N.M. 1992)).

JPMorgan Chase argues that both the First Release and the Second Release expressly state that they are effective as to "all of the real estate mentioned in said mortgage from the lien and operation thereof," but that they do not release Vilar's underlying debt obligations.  MTD at 8 (quoting First Release at 1; Second Release at 2)(internal quotation marks omitted).  Moreover, JPMorgan Chase notes, the Letter specifically warned Vilar: "Please note this amount is for the release of the lien(s) *only* and ***that you are responsible for any deficiency balances per the terms of the original loan transaction***."  MTD at 8 (emphases in MTD but not in Letter)(bold in MTD and Letter).  JPMorgan Chase also states that the second page of the Letter also notified Vilar that the reporting which she alleges is unlawful would occur after the transaction.  <u>See</u> MTD at 8 (citing Letter at 2).

JPMorgan Chase contends that Vilar's attempts to demonstrate through the Purchase Agreement and Wire Transfer forms that JPMorgan Chase impliedly waived its rights to collect the full amount that Vilar owed on the Second Mortgage "are a red herring."  MTD at 8. JPMorgan Chase points out that waiver of a contractual right must be knowingly, intentionally, and consensually made.  <u>See</u> MTD at 8.  JPMorgan Chase argues that, accordingly, the fact that the Second Mortgage's loan number appears on both the Purchase Agreement and Wire Transfer forms -- documents which JPMorgan Chase did not create and to which it was not a party -- cannot support an allegation that JPMorgan Chase waived its right to collect the outstanding balance that Vilar owed when it released the liens on the Property.  <u>See</u> MTD at 8.  JPMorgan Chase concludes that, because it never released or waived its right to pursue the underlying debt

on the Second Mortgage from Vilar, it has not reported any inaccurate information to consumer reporting agencies.  See MTD at 9.

JPMorgan Chase next addresses Vilar's claim that it negligently violated § 1681i of the FCRA.  See MTD at 9-10.  JPMorgan Chase reiterates that it has reported only accurate information to CRAs, because it never waived its right to collect the outstanding balance owed. See MTD at 9.  JPMorgan Chase asserts that, consequently, Vilar cannot plausibly argue that it failed to correct inaccurate or unverifiable information.  See MTD at 10.  Moreover, according to JPMorgan Chase, the results of any investigation could have led to only one inevitable conclusion: Vilar's debt has never been paid and JPMorgan Chase has never discharged it.  See MTD at 10.  JPMorgan Chase states that, in short, Vilar's claim that it negligently violated § 1681i of the FCRA must fail, because "you cannot negligently report the truth."  MTD at 10.

Turning to Vilar's claim that it engaged in unfair, deceptive, and unconscionable trade practices, in violation of § 57-12-2 of the UPA, JPMorgan Chase says that, because Vilar has not pled that it has reported anything but accurate information to consumer reporting agencies, the Court must dismiss her UPA claim.  See MTD at 10-12.  JPMorgan Chase points out that a UPA claim for unfair trade practices requires a showing of: (i) a knowingly false or misleading statement; (ii) made in connection with the sale of goods or services; (iii) by a person in the regular course of business; and (iv) that may, or tends to, deceive or mislead any person.  See MTD at 10 (citing N.M. Stat. Ann. § 57-12-2(D)).  According to JPMorgan Chase, a plausible UPA claim for an unconscionable trade practice requires a showing that an action: (i) was performed in connection with the sale of goods or services; (ii) by a person in the regular course of that person's trade or commerce; and (iii) either took advantage of the plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree or resulted in a gross

disparity between the value that the plaintiff received and the price paid.  See MTD at 10 (citing N.M. Stat. Ann. § 57-12-2(D)).

JPMorgan Chase says that there is no allegation that it (i) made a false or misleading statement; or (ii) knowingly did so.  See MTD at 11.  JMorgan Chase contends that Vilar's UPA claim must fail, because "one cannot knowingly misstate the truth."  MTD at 11.  JPMorgan Chase also argues that, at most, the Amended Complaint implies that Vilar misunderstood the short sale as extinguishing her debt.  See MTD at 11 n.10.  JPMorgan Chase adds that, as the Letter explained, JPMorgan Chase was free to report -- or not report -- Vilar's delinquent debt to a CRA.  See MTD at 12.  JPMorgan Chase says that, rather than committing any unlawful actions, it warned Vilar "that it would report the deficiency and then did so."  MTD at 12.  JPMorgan Chase contends that Vilar, therefore, has no cognizable UPA claim against it.  See MTD at 12.

Finally, JPMorgan Chase addresses Vilar's claim that it violated §§ 1692g(a) and 1692e(2)(A) of the FDCPA.  See MTD at 12-13.  JPMorgan Chase asserts that neither §1692g(a) nor § 1692e(2)(A) apply to JPMorgan Chase, because it does not fit within the FDCPA's definition of a "debt collector."  MTD at 12.  JPMorgan Chase states:

> 15 U.S.C. § 1692g(a) provides in part, that a "debt collector shall . . . send the consumer a written notice containing" a variety of information.  15 U.S.C. § 1692e(2)(A) states that a "debt collector may not" make a "false representation of (A) the character, amount, or legal status of any debt."  Consequently, "a defendant can be liable for violating FDCPA only if she is a 'debt collector' within the meaning of the FDCPA."  James v. Wadas, 724 F.3d 1312, 1316 (10th Cir. 2013).
>
> Under the FDCPA a "debt collector" does not include: "[A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F).  In other words, assuming the entity pursuing the debt "acquires a 'debt not in default' it is categorically not a debt collector." McKinney v. Cadleway Prop.,

- 14 -

Inc., 548 F.3d 496, 501 (7th Cir. 2008).

MTD at 12-13 (omissions in MTD but not in source).

JPMorgan Chase says that Vilar admits that the debt associated with her loans was not in default when JPMorgan Chase obtained it in June, 2007.  See MTD at 12. JPMorgan Chase contends that, accordingly, it is not a "debt collector," and, therefore, cannot be liable under the FDCPA.  MTD at 13.  JPMorgan Chase argues that, even if it were a "debt collector" under the FDCPA, the Amended Complaint's bare, vague, and conclusory allegations that it failed to provide proper notice are insufficient to state a plausible claim under either § 1692g(a) or § 1692e(2)(A).  See MTD at 13-14.

**2.      Response.**

Vilar responded to the MTD on August 11, 2014.  See Plaintiff's Opposition to JP Morgan Chase Bank, N.A.'s Motion to Dismiss the Amended Complaint for Failure to State a Claim, filed August 11, 2014 (Doc. 74)("Response").  Vilar advances three arguments in the Response.  See Response at 3-10.  First, Vilar argues that JPMorgan Chase waived its right to collect the full amount that Vilar owed on the Second Mortgage.  See Response at 3.  Vilar states:

> [T]he central point and purpose to the Chase's [sic] entire letter is that it is willing to waive its right to collect the full amount due on the mortgages and its agreement to release the "lien(s)" when less than full payment is made.
>
> Chase's entire argument about the lack of waiver concerns Chase's alleged failure to waive its right to collect the full amount due on the second mortgage. The flaw in the argument is that Chase never mentions the lack of an express waiver of its right to collect the full amount due on the first mortgage.  Apparently [the Letter] is sufficient to waive Chase's rights as to the first mortgage, but grossly insufficient to waive its rights as to the second.
>
> [The Letter] then contains the following statement, "Please note this amount is for the release of the lien(s) only and that you are responsible for all deficiency balances per the terms of the original loan documents."   If this

language is taken as Chase suggests, the remaining balances of the $160,000 first mortgage could not be paid in full from the short sale.  Since both loans were taken out in June 2007, both had sizable balances still due.  The short sale amount could have paid off the second mortgage and paid down the first, but that's not how Chase applied the funds.  Instead, the short sale proceeds were accepted as payment in full settlement of the first mortgage, and nothing was credited to the second mortgage.

Response at 3-4 (citations omitted)(emphases omitted).  The crux of Vilar's first argument is that the Letter, the Purchase Agreement, and the Wire Transfer all gave her the impression that JPMorgan Chase accepted the short-sale amount as payment for both the First Mortgage and the Second Mortgage.  See Response at 4-6.

Second, Vilar reiterates the argument from the Amended Complaint that JPMorgan Chase failed to inform her that the short sale's proceeds applied to the First Mortgage but not the Second Mortgage.  See Response at 6.  Vilar points out that such a practice is contrary to local custom in regard to short sales when there are two or more mortgages involved.  See Response at 6.  Vilar asserts that JPMorgan Chase does not contend that it sent her a notice regarding any unpaid deficiency as § 1692g(a) of the FDCPA requires.  See Response at 6.  Vilar contends that the Letter does not meet § 1692a(6)'s requirements because it did not state the amount that Vilar still owed, the terms of her payments, or her rights to dispute the validity of a deficiency after a short-sale transaction.  See Response at 6-7 (citation omitted).  Vilar points out that she did not receive any correspondence regarding this debt until August, 2012.  See Response at 7.

Vilar argues that JPMorgan Chase's collection and foreclosure departments are debt collectors under the FDCPA, because "they used an instrumentality of interstate commerce or the mails in their businesses the principal purpose of which is the enforcement of security interests."  Response at 7 (citing 15 U.S.C. § 1692a(g)).  Vilar adds:

> Chase is a debt collector because, not only has it created specific departments within its huge corporate bureaucracy to collect its own debts when

they go into default, but it also utilizes a system by which a debt is not sold but is transferred for the purpose of collection in the name of another company instead of its own (i.e., Real Time Resolutions, RCS Financial Services, EMC Mortgage Corporation).  15 U.S.C. § 1692a(6)(B).  This makes it appear that a third party became responsible for the debt in December 2010 and attempted to collect it.

Response at 7-8 (footnote omitted).

Third, Vilar states that she has pled sufficient facts to state plausible claims against JPMorgan Chase for intentional and negligent violations of the FCRA and of the UPA.  See Response at 8-10.  Vilar contends that the MTD makes two conflicting arguments:

First, it went through the entire short sale transaction under the loan numbers for both the first and the second mortgages, and accepted wired funds for "Payoff first mortgage" and "short sale payoff loan 24723025" when it had also either transferred or sold the right to negotiate and collect upon the debt before the short sale ever took place.

Second, Chase claims it never released the second mortgage, and thus its reporting of Plaintiff's second mortgage as active from February 2012 through April 2013 is accurate.  However, Chase does not contradict clear that in December 2010 it transferred all of its rights to negotiation, collection and payment of the debt to a third party, without giving notice to the borrower/debtor. . . . Chase contends that it has "never waived its right to collect the outstanding balance owed," but it did assign and subsequently sell that right.  It could not continue to report the debt as its own.

Response at 9 (citations omitted).  Vilar concludes the Response by arguing that JPMorgan Chase's actions of misleading her, her realtor, and the title company into thinking that both the First and Second Mortgage were settled through payment of the short-sale funds is a deceptive trade practice under § 57-12-2(D), and an unconscionable trade practice under § 57-12-2(E)(1).  See Response at 9-10.

**3.    Reply.**

JPMorgan Chase replied to the Response on September 9, 2014.  See JPMorgan Chase Bank, N.A.'s Reply in Support of Motion to Dismiss, filed September 9, 2014 (Doc.

78)("Reply").[13]    In the Reply, JPMorgan Chase raises four new arguments in support of the MTD.  See Reply at 3-5.  First, JPMorgan Chase argues that the Response cannot supplement the Amended Complaint.   See Reply at 3.   JPMorgan Chase asserts that the Court should not consider any additional factual arguments that Vilar raised in the Response, because doing so would be improper at the motion-to-dismiss stage.  See Reply at 3.  JPMorgan Chase contends that, although Vilar attempted to explain in the Response why her understanding of the Purchase Agreement and the Wire Transfer led her to believe that the sale satisfied the Second Mortgage, JPMorgan Chase did not prepare those documents, and Vilar cannot point to any of JPMorgan Chase's statements that led her to such a conclusion.  See Reply at 4.

Second, JPMorgan Chase asserts that Vilar's contention that the short sale's proceeds should have been applied to the Second Mortgage first is "illogical" and "contrary to fundamental mortgage law."  Reply at 4.  JPMorgan Chase explains that, when distributing funds from a foreclosure sale, the surplus funds are "applied to liens and other interests terminated by the foreclosure in order of their priority and the remaining balance."  Reply at 4 (quoting Bank of Am., N.A. v. BA Mortg., LLC, 2005-NMCA-037, ¶ 9, 111 P.3d 226, 228 (N.M. Ct. App. 2005)(internal quotation marks omitted).

Third, JPMorgan Chase asserts that, even if it transferred Vilar's debt to a third-party debt collection agency -- as Vilar asserts -- that would not make it a debt collector under the FDCPA.  See Reply at 6.  Instead, JPMorgan Chase states, that would make it a "transferor of the

---

[13]JPMorgan Chase filed a document titled "J.P. Morgan Chase Bank, N.A.'s Motion to Dismiss for Failure to State a Claim" on September 4, 2014.  Doc. 78.  That same day, however, JPMorgan Chase filed an errata to change the title of Doc. 78 to "JPMorgan Chase Bank, N.A.'s Reply in Support of Motion to Dismiss."  JPMorgan Chase Bank, N.A.'s Errata to Correct Title of Document, filed September 4, 2014 (Doc. 79)("Errata").  For clarity, the Court will refer to Doc. 78 as the "Reply."

debt to a debt collector, not a debt collector itself."  Reply at 6.  JPMorgan Chase also notes that numerous federal courts have repeatedly determined that lenders collecting debt which they originated or obtained before default are not debt collectors under the FDCPA.  See Reply at 6 (citing Huy Thanh Vo v. Nelson & Kennard, 931 F. Supp. 2d 1080 (E.D. Cal. 2013); Cooper v. Pressler & Pressler LLP, 912 F. Supp. 2d 178 (D.N.J. 2012); Thomasson v. Bank One, La., N.A., 137 F. Supp. 2d 721 (E.D. La. 2001)).

### 4.  November 13, 2014, Hearing.

The Court held a hearing on the MTD on November 13, 2014.  See Transcript of Hearing (taken Nov. 13, 2014)("Tr.").[14]  At the hearing, the parties largely reiterated the arguments from the briefing.  See Tr. at 5:8-42:15 (Court, Shafer, Bousliman).  Beginning with Vilar's FCRA claims, JPMorgan Chase argued that it never waived its right to collect full payment on the Second Mortgage, and, therefore, could not have inaccurately reported Vilar's delinquency on that mortgage.  See Tr. at 5:8-8:13 (Bousliman).  JPMorgan Chase asserts that, because it accurately reported Vilar's information to CRAs, Vilar's FCRA claims fail as a matter of law. See Tr. at 5:8-8:13 (Bousliman).

Vilar initially argued that the local custom and practice in New Mexico is that short sales satisfy all of the mortgages on a particular property.  See Tr. at 19:23-20:16 (Shafer).  Vilar contended that the ambiguity of the Letter, the Wire Transfer, and the Purchase Agreement, in addition to the local custom led her to believe that the short sale had satisfied her obligations under both the First Mortgage and Second Mortgage.  See Tr. at 9:9-12:18 (Shafer).  In Vilar's view, because of this ambiguity, JPMorgan Chase had a responsibility to inform her that she had

---

[14]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

an outstanding balance on the Second Mortgage, the exact amount that she owed, her monthly payment amounts, and where she should send her payments.  <u>See</u> Tr. at 11:1-12 (Shafer).  Vilar contends that, because JPMorgan Chase did not tell her that information, it could not turn around and report her debts as delinquent to CRAs.  <u>See</u> Tr. at 11:5-12:18 (Shafer).

Turning to Vilar's UPA claim, JPMorgan Chase asserted that there are no allegations in the Amended Complaint that it ever made a false and misleading statement.  <u>See</u> Tr. at 15:4-13 (Bousliman). Vilar responded that it was misleading for JPMorgan Chase to include the loan numbers from the First Mortgage and Second Mortgage in the Letter.  <u>See</u> Tr. at 17:19-21 (Shafer).  When the Court pressed Vilar as to what was misleading about having both of those numbers in the Letter, Vilar stated that it was misleading because there is no indication in the Letter as to what she still owed on the Second Mortgage.  <u>See</u> Tr. at 18:12-24 (Court, Shafer). Vilar stated that, because the custom and practice in New Mexico is for short sales to extinguish all remaining debt obligations on a property, it was misleading for JPMorgan Chase not to clarify that she still had an outstanding debt obligation on the Second Mortgage.  <u>See</u> Tr. at 19:15-18 (Shafer); <u>id.</u> at 19:23-20:23(Shafer).   Vilar later stated, however, that in the Second Judicial District of the State of New Mexico, "it is very difficult to get a deficiency judgment on these types of cases.  In this part of the world, they are not the norm."  Tr. at 29:2-7 (Shafer). JPMorgan Chase agreed that the local custom and practice is not that lenders waive their rights to obtain deficiency judgments, but instead that the Second Judicial District judges refuse to enforce such judgments.  <u>See</u> Tr. at 32:4-12 (Bousliman).

The Court asked Vilar whether, in light of the fact that JPMorgan Chase continued to act like it owned the Second Mortgage throughout the allegations in the Complaint, there was any evidence that it does not own the Second Mortgage.  <u>See</u> Tr. at 22:11-13 (Court).  Vilar said:

- 20 -

It's questionable, Your Honor. . . .  Counsel for Real Time and I . . . went back and forth informally, and I asked her -- she said the notes still belong to Chase when it went to Real Time; just transferred collection rights.

And I said, "Can you show me anything that indicates that?"  And she couldn't.  She produced one line of computer letters and numbers that she said showed that, but neither one of us understood it, and we admitted that to one another.  And so I have yet to see a contract between Real Time and Chase which shows that it was a transfer of collection rights versus a sale.

Tr. at 22:14-23:2 (Shafer).  At the conclusion of the hearing the Court said that, although it was inclined to grant the MTD on the UPA claim, it would have to take the other claims under advisement.  See Tr. at 43:5-11 (Court).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face.").  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

 The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination."  Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

"[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide

swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING THE FCRA

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). The FCRA addresses the chief Congressional concerns, including the accuracy of consumer reports and problems associated with resolving disputed information. See S. Rep. No. 91-517 at 1 (1969). In enacting the FCRA, Congress "creat[ed] a system intended to give consumers a means to dispute -- and, ultimately, correct -- inaccurate information on their credit reports." Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004). The FCRA's purpose is "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 at 1 (1969).

1.   **The FCRA Imposes Duties Upon Furnishers of Disputed Information When They Receive Notification of a Dispute from a Consumer Reporting Agency.**

The FCRA also places certain duties upon furnishers of credit information. A furnisher of information is "an entity which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies." Fishback v. HSBC Retail Servs. Inc., 944 F. Supp. 2d 1098, 1107 (D.N.M. 2013)(Browning, J.)(quoting Jarrett v. Bank of Am., 421 F. Supp. 2d 1350, 1352 n.1 (D. Kan. 2006))(internal quotation marks omitted). Section 1681s-2(a) requires that furnishers provide accurate information to CRAs. See 15 U.S.C. § 1681s-2(a). Section 1681s-2(b) imposes a duty on furnishers after receiving notice of a consumer

dispute from a CRA to investigate and report incomplete and inaccurate information to them. See DiMezza v. First USA Bank, 103 F. Supp. 2d 1296, 1299 (D.N.M. 2000)(Vazquez, J.). Section 1681s-2(a) "exclusively limits enforcement of the accurate information provisions under § 1681s-2(a) to federal and state officers." DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299. Sections 1681n(c) and 1681o(b) provide a private right of action against CRAs and furnishers of credit information that do not comply with the FCRA willfully or negligently, absent an explicit exception. DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299.

A consumer can also bring a private cause of action against the furnisher for violations of § 1681s-2(b). See DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299. After a CRA notifies a furnisher of a consumer dispute regarding the completeness or accuracy of information that the furnisher previously provided, the furnisher is obligated to conduct an investigation with respect to the disputed information, review all relevant information the CRA provided, and report the results of the investigation to the CRA. See 15 U.S.C. § 1681s-2(b)(1)(A)-(C). If the investigation reveals that the information is incomplete or inaccurate, the furnisher must report those results to all other CRAs that compile and maintain files on consumers on a nationwide basis to which the furnisher supplied the information. See 15 U.S.C. § 1681s-2(b)(1)(D). The furnisher must modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable. See 15 U.S.C. § 1681s-2(b)(1)(E). A consumer can bring a cause of action through §§ 1681n and 1681o based upon a furnishers' willful or negligent failure to perform these duties after a CRA notifies the furnisher of a consumer dispute. See DiMezza v. First USA Bank, 103 F. Supp. 2d at 1300.

"When the furnisher receives notice of a dispute from the credit reporting agency, it must perform the verification and correction duties described in [§] 1681s-2(b)." Sanders v. Mountain

Am. Fed. Credit Union, 689 F.3d 1138, 1147 (10th Cir. 2012).  These duties do not arise until after a CRA notifies a furnisher of a dispute.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x 744, 751 (10th Cir. 2009)(unpublished)[15].  Notice directly from a consumer does not give rise to these duties.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751.  When a consumer contacts a CRA to dispute information on a credit report, the CRA is obligated to contact the furnisher of the information.  See 15 U.S.C. § 1681i(a)(2).  "The FCRA does not require a CRA to tell a *consumer* when it notifies a *furnisher of information* about the consumer's dispute."   Lang v. TCF Nat'l Bank, 249 F. App'x 464, 466 (7th Cir. 2007)(unpublished)(emphases in original).  The consumer cannot recover under § 1681s-2(b) if they do not initiate the process for recovery by notifying a CRA of the dispute.  See Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147.

"Where a plaintiff has not alleged that CRAs were notified of disputed credit information, the Tenth Circuit has found that the plaintiff did not sufficiently allege that the furnishers of the disputed information had a duty under § 1681s-2(b)."  Fishback v. HSBC Retail Servs. Inc., 944 F. Supp. 2d at 1108 (citing Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147 (holding that a district court properly dismissed a plaintiff's FCRA claim because the

---

[15]Pinson v. Equifax Credit Information Services is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Pinson v. Equifax Credit Information Services has persuasive value with respect to material issues and will assist the Court in its preparation of this Memorandum Opinion and Order.

plaintiff did not allege notification of the dispute to a CRA); Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751 (holding that plaintiffs failed to state a claim for relief under the FCRA because they alleged only that they notified a furnisher -- not a CRA -- of a dispute)). In Pinson v. Equifax Credit Information Services, the Tenth Circuit affirmed the district court's dismissal of the Pinsons' FCRA claim for failing to state a claim for relief, because the Pinsons alleged that they notified only the furnisher of the disputed information -- Capital One -- of their dispute, and not any CRAs.  See 316 F. App'x at 751.  The Pinsons notified a CRA in 2003 of one instance of reporting false or inaccurate information.  See Pinson v. Equifax Credit Info. Servs., No. CIV 06-0162 GKF/SAJ, 2008 WL 906222, at *3 (N.D. Okla. Mar. 31, 2008).  The district court did not consider the 2003 notification to the CRA in the Pinsons' complaint, because the Pinsons filed their cause of action in 2006, putting the notice outside of the two-year statute of limitations of § 1681p.  See 2008 WL 906222, at *3.  Because a furnisher's duties arise only after a CRA's notification of a dispute, and because the Pinsons' complaint did not allege that they notified a CRA within the statute of limitations, the Pinsons' complaint failed to state a claim under the FCRA.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751.

In Sanders v. Mountain American Federal Credit Union, the Sanders alleged that the defendant, Mountain America, incorrectly reported that the Sanders opened twelve new accounts and was liable for damages under the FCRA for the erroneous reporting.  See 689 F.3d at 1147. The Tenth Circuit, in an opinion that the Honorable Terrence L. O'Brien, United States Circuit Judge for the Tenth Circuit, wrote, and Judges McKay and Kelly joined, affirmed the district court's conclusion that the Sanders did not have a claim under the FCRA, because they did not allege that they notified a CRA of the dispute with the credit information that Mountain America furnished.  See Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147; Llewellyn v.

Shearson Fin. Network, 622 F. Supp. 2d 1062, 1072-73 (D. Colo. 2009)(finding that a plaintiff failed to state a claim for a FCRA violation against a furnisher, because the plaintiff did not allege "that he notified a credit reporting agency of his dispute over [the furnisher]'s information, and that the credit reporting agency supplied [the furnisher] with notice of that dispute").  As the plaintiffs in these cases had not notified a CRA of the dispute, a CRA could not have notified the furnisher of the disputed information to trigger the furnisher's duties under the FCRA.

The United States Court of Appeals for the Seventh Circuit, in an opinion that the Honorable Ilana D. Rovner, United States Circuit Judge for the Seventh Circuit, wrote, and Judges Wood and Williams joined, has held that a plaintiff sufficiently states a claim for a violation of the FCRA against a furnisher where the plaintiff contacted a CRA regarding the dispute, although the plaintiff did not allege that the CRA contacted the furnisher of the disputed information.   See Lang v. TCF Nat'l Bank, 249 F. App'x 464, 466-67 (7th Cir. 2007)(unpublished).  Judge Rovner concluded that the plaintiffs allegations were sufficient to provide notice of the claim to the furnisher, TCF National Bank, because the plaintiff asserted that he told a CRA of the dispute, that TCF Bank refused to investigate or correct the false report, and that TCF Bank violated the FCRA.  See Lang v. TCF Nat'l Bank, 249 F. App'x at 466.  Judge Rovner noted a practical reason for not requiring the plaintiff to allege that a CRA notified the furnisher: the CRA is not required to notify the consumer that it has contacted the furnisher, and, thus, "a consumer may not, at the time of filing a complaint, be in a position to allege that notification."  Lang v. TCF Nat'l Bank, 249 F. App'x at 466.  Judge Rovner held that the plaintiff's "recovery under the FCRA is *plausible,* which is all that notice pleading requires." Lang v. TCF Nat'l Bank, 249 F. App'x at 467 (emphasis in original).  See Huber v. Trans Union, LLC, No. CIV 11-0139, 2012 WL 3045686 at *3 (S.D. Ind. July 25, 2012)(unpublished)("If a

plaintiff alleges that she notified a CRA that she disputed specific information . . . she need not also allege that the CRA notified the information furnisher of the dispute because it is the CRAs obligation under the law to do so.").

      **2.**       **Duty of a Furnisher to Accurately Report a Dispute Under Section 1681S2(B) of the FCRA.**

After the furnisher receives notice of a dispute from a CRA, § 1681s-2(b) requires the furnisher to report the results of its investigation into the dispute to the CRA and, "if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information." 15 U.S.C. § 1681s-2(b). "The purpose of § 1681s-2(b) is to require furnishers to investigate and verify that they are in fact reporting complete and accurate information to the CRA's after a consumer has objected to the information in his file." Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1164 (9th Cir. 2009).

The Tenth Circuit has stated:

> [A]s several of our sister circuits have explained, the FCRA's requirement that furnishers of information correct "incomplete or inaccurate" information, 15 U.S.C. § 1681s-2(b)(1)(D), extends not only to false information, which "is clearly inaccurate," but to information provided "in such a manner as to create a materially misleading impression" as well.

Llewellyn v. Allstate Home Loans, Inc., 711 F.3d at 1186 (citing Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 617 (6th Cir. 2012)).  See Saunders v. Branch Banking & Trust Co., 526 F.3d at 148 ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression."); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 (holding that a credit report may be deemed "'incomplete or inaccurate' within the meaning of the FCRA 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be

expected to adversely affect credit decisions'"(quoting Sepulvado v. CSC Credit Servs., 158 F.3d 890, 895 (5th Cir. 1998))).

An accurate statement may be misleading if it can reasonably be interpreted in an inaccurate, adverse manner. See Pinner v. Schmidt, 805 F.2d 1258, 1262-63 (5th Cir. 1986)(finding that the statement "litigation pending" on a plaintiffs credit report could have been interpreted as indicating that a furnisher brought a suit against the plaintiff, when the reverse was accurate); Dalton v. Capital Assoc'd Indus., Inc., 257 F.3d 409, 415-16 (4th Cir. 2001)(finding a genuine issue of material fact existed regarding the accuracy of a plaintiff's credit report where a jury could reasonably interpret the report as indicating that the plaintiff was convicted of a felony, although the plaintiff had actually pled guilty to a misdemeanor). In Pinner v. Schmidt, the United States Court of Appeals for the Fifth Circuit affirmed a jury verdict finding that a CRA had breached its statutory duty under the FCRA to follow reasonable procedures to assure the maximum possible accuracy of a consumer's credit report where "any person could easily have construed the notation 'Litigation Pending' as an indication that the plaintiff was being sued by [the furnisher], while the actual situation was the reverse." 805 F.2d at 1262. The Fifth Circuit stated that "[i]t would have been a simple matter to prevent this ambiguity" particularly in light of the CRA's knowledge of the dispute. 805 F.2d at 1263.

In Dalton v. Capital Associated Industries, Inc., Richard Dalton alleged that a CRA inaccurately reported his criminal history, which included a guilty plea to a misdemeanor, by reporting: "Felony -- Third degree assault -- 1/26/94 -- Guilty -- 710 days suspended sentence, 20 days jail sentence, 2 years probation." 257 F.3d at 415-16. The United States Court of Appeals for the Fourth Circuit stated that a jury could reasonably conclude that "the report indicates that

Dalton was guilty of a felony" and, therefore, "inaccuracy would be established because it is undisputed that Dalton pled guilty to a misdemeanor." 257 F.3d at 416.

The duty to report a dispute does not extend to meritless disputes, "because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading." Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163. Failing to report a bona fide dispute is materially misleading, because it creates the impression that the consumer is financially responsible for a debt for which the consumer may not actually be responsible. See Saunders v. Branch Banking & Trust Co., 526 F.3d at 149-50 ("[I]f a consumer has a meritorious dispute . . . the consumer's failure to pay the debt does not reflect financial irresponsibility."). "It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)." Saunders v. Branch Banking & Trust Co., 526 F.3d at 149-50. If this duty were required for meritless disputes, a consumer could prevent a genuine debt from impairing the consumer's credit reputation by indefinitely disputing the debt.

Some courts have noted that whether credit information is materially misleading is a question for the fact finder. See, e.g., Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 ("The consumer must still convince the finder of fact that the omission of the dispute was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect.'" (quoting Saunders v. Branch Banking & Trust Co., 526 F.3d at 150)); Krajewski v. Am. Honda Fin. Corp., 557 F. Supp. 2d 596, 615 (E.D. Pa. 2008)(finding that whether a credit report was accurate depended on the meaning of "repossession" as used in the report and, given the definitions of repossession, a reasonable jury could conclude that the CRA's reporting could be so misleading as to be inaccurate).

- 30 -

## LAW REGARDING THE UPA

"The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices."  Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507, 2012 WL 1132414, at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(citing Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009,  ¶ 22, 227 P.3d 73, 80 (2010)).  "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096 (N.M. Ct. App. 2007).  To state a claim under the UPA, a complaint must allege:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100,  ¶  5  (citing N.M. Stat. Ann. § 57-12-2(D)); Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d 1308, 1311 (N.M. 1991)).  "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 199-NMCA-112, ¶ 17, 965 P.2d 332, 338 (N.M. Ct. App. 1998).

Under the UPA, "[a]ny person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a[n] . . . [unfair practice] . . . may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater." N.M. Stat. Ann. § 57-12-10B.   The UPA authorizes two private remedies.   First, under § 57-12-10(A),

> [a] person likely to be damaged by an unfair or deceptive trade practice or by an unconscionable trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.

> Proof of monetary damage, loss of profits or intent to deceive or take unfair advantage of any person is not required.

N.M. Stat. Ann. § 57-12-10(A).  Second, under § 57-12-10(B),

> [a]ny person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater. Where the trier of fact finds that the party charged with an unfair or deceptive trade practice or an unconscionable trade practice has willfully engaged in the trade practice, the court may award up to three times actual damages or three hundred dollars ($300), whichever is greater, to the party complaining of the practice.

N.M. Stat. Ann. § 57-12-10(B).  The first remedy under the statute -- injunctive relief -- expressly is not conditioned upon proof of monetary loss.  See N.M. Stat. Ann. § 57-12-10(A). Instead, any person likely to be damaged by an unfair or deceptive trade practice of another may obtain such relief; monetary loss is "not required."  N.M. Stat. Ann. § 57-12-10(A).

If the trier of fact finds that the violation of the UPA was committed willfully, the court may award up to three times the actual damages to the injured party.  See N.M. Stat. Ann. § 57-12-10(B). The UPA does not mention claims for punitive damages.  See N.M. Stat. Ann. § 57-12-10. The relief that the UPA provides is in addition to remedies otherwise available for the same conduct under the common law or other New Mexico statutes.  See N.M. Stat. Ann. § 57-12-10(D).

## LAW REGARDING THE FDCPA

The FDCPA regulates abusive practices of "debt collectors," and the statute includes a specific definition of that term.  15 U.S.C. § 1692a(6).  A "debt collector" is an entity that uses interstate commerce or the mail to collect debts as its principle business, or that "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  A company collecting debts owed to itself, however, is not

a "debt collector" unless it "uses any name other than [its] own which would indicate that a third person is collecting . . . such debt." 15 U.S.C. § 1692a(6).   See 15 U.S.C. § 1692a(6)(F) (providing that a "debt collector" does not include persons collecting debts owed to themselves under an original obligation).   "'[A] distinction between creditors and debt collectors is fundamental to the FDCPA, which does not regulate creditors' activities at all.'"   Schmitt v. FMA Alliance, 398 F.3d 995, 998 (8th Cir. 2005)(quoting Randolph v. IMBS, Inc., 368 F.3d 726, 729 (7th Cir. 2004)).   Cf. Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000)("Creditors -- as opposed to 'debt collectors' -- generally are not subject to the FDCPA.").

Thus, courts dismiss for failure to state a claim suits brought under the FDCPA against credit card companies or banks that extend credit and attempt to collect the unpaid debt. See, e.g., Lewis v. ACB Bus. Servs, Inc., 135 F.3d 389, 411 (6th Cir. 1998)(holding that credit card company that sued debtor in state court to collect debt could not be sued under FDCPA, because it "is primarily in the business of extending credit, which is not enough to turn an entity into a debt collector under the Act"); Montgomery v. Huntington Bank, 346 F.3d 693, 698-99 (6th Cir. 2003)(holding that bank, which was a consumer creditor of plaintiff, was not liable under the FDCPA, because it did not fall within the definition of debt collector and was expressly covered by creditor exceptions).   Further, "a creditor cannot be held vicariously liable under the FDCPA for abusive actions by independent collection agencies." Duncan v. Citibank (S. Dakota), N.A., No. CIV. 06-0246 JB/KBM, 2006 WL 4063022, at *3 (D.N.M. June 30, 2006)(Browning, J.)(citing Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 108 (6th Cir. 1996)).   Other courts have dismissed cases brought against Citibank or its affiliates under the FDCPA for these reasons.   See, e.g., Doherty v. Citibank (South Dakota), N.A., 375 F. Supp. 2d 158, 162 (E.D.N.Y. 2005); Kloth v. Citibank (South Dakota), N.A., 33 F.

Supp. 2d 115, 119 (D. Conn. 1998); <u>Meads v. Citicorp Credit Servs, Inc.</u>, 686 F. Supp. 330, 333-34 (S.D. Ga. 1988)).

<u>**ANALYSIS**</u>

The Court will grant the MTD.  First, Vilar cannot bring a claim that JPMorgan Chase willfully violated § 1681s-2a of the FCRA, because that section does not give rise to a private cause of action.  Moreover, even if § 1681s-2a gave rise to a private cause of action, Vilar does not plausibly allege that JPMorgan Chase reported inaccurate information to any CRAs.  Second, Vilar cannot bring a claim against JPMorgan Chase for negligently violating § 1681i of the FCRA, because JPMorgan Chase is not a CRA and is, therefore, not subject to § 1681i's requirements.  Third, Vilar does not plausibly allege that JPMorgan Chase violated § 57-12-2 of the UPA, because the UPA does not require lenders to disclose all helpful information, but instead prohibits them from disseminating misleading, deceitful, or false information; Vilar attempts to turn the UPA into a full-disclosure statute, when it is not.  Similarly, Vilar's contention that JPMorgan Chase violated the UPA by misrepresenting that it owned the Second Mortgage when it accepted the short-sale's proceeds is, at this time, implausible.  Fourth, Vilar does not plausibly allege that JPMorgan Chase violated either § 1692g(a) or § 1692e(2)(a) of the FDCPA, because it is not a "debt collector," and is, therefore, not subject to the FDCPA.  Consequently, the Court will grant the MTD.

**I.    VILAR CANNOT BRING A CLAIM AGAINST JPMORGAN CHASE FOR WILLFULLY VIOLATING § 1681s-2a OF THE FCRA.**

Vilar cannot bring a claim against JPMorgan Chase for willfully violating § 1681s-2a of the FCRA.  Section 1681s-2(a) requires that furnishers provide accurate information to CRAs.  <u>See</u> 15 U.S.C. § 1681s-2(a).  The Court has previously recognized, however, that § 1681s-2(a) does not give rise to a private cause of action, but instead "exclusively limits enforcement of the

accurate information provisions under § 1681s-2(a) to federal and state officers." Fishback v. HSBC Retail Servs. Inc., 944 F. Supp. 2d at 1107 (quoting DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299)(internal quotation marks omitted).   Section 1691s-2(c)(1)'s plain language dictates such a conclusion.   See 15 U.S.C. § 1681s-2(c)(1)("Except [for circumstances not relevant here], sections 1681n and 1681o of this title[providing private right of action for willful and negligent violations] do not apply to any violation of . . . subsection (a) of this section, including any regulations issued thereunder.").   The Tenth Circuit has reached the same conclusion, albeit in an unpublished opinion.   See Pinson v. Equifax Credit Info. Servs., Inc., 316 F. App'x at 751 ("[Section 1681s-2(a)] provides no private cause of action.").   Moreover, the other United States Courts of Appeals that have addressed the issue unanimously agree that § 1681s-2a does not provide a private action.   See, e.g., Chiang v. New England Inc., 595 F.3d 26, 35 (1st Cir. 2009)(holding that "Congress expressly limited furnishers' liability under § 1681s-2(a) by prohibiting private suits for violations of that portion of the statute"); Gorman v. Wolpoff & Abramson, 584 F.3d 1147, 1162 (9th Cir. 2009)("[Plaintiff] has no private right of action under § 1681s-2(a)(3) to proceed against [a data furnisher] for its . . . failure to notify the [credit reporting agencies] that he disputed the . . . charges [at issue].").   Because § 1681s-2(a) does not give rise to a private cause of action, Vilar cannot plausibly allege that JPMorgan Chase willfully violated that section.

Moreover, even if § 1681s-2(a) gave rise to a private cause of action, there is no indication that JPMorgan provided inaccurate information to any CRA.   Vilar's claims are largely based on an incorrect assumption: that the short sale of her home extinguished her obligations under both the First and Second Mortgages.   Vilar argues that, because the short sale extinguished her entire debt obligation to JPMorgan Chase, JPMorgan Chase inaccurately

reported to the CRAs that she was delinquent in paying the Second Mortgage.  Vilar's argument, however, has no sound basis in the relevant law or in the case's facts.

There is no indication that the Letter or any of the other documents that Vilar attached to the Complaint released her debt on the Second Mortgage.  The Supreme Court of New Mexico has held that a lender's misinterpretation of documents or even clerical errors indicating a loan has been paid in full do not release a lender's right to repayment.  See Sunwest Bank of Clovis, N.A. v. Garrett, 1992-NMSC-002, ¶ 10.   In Sunwest Bank of Clovis, N.A. v. Garrett, for example, the Supreme Court of New Mexico, in an opinion authored by the Honorable Joseph F. Baca, then-Associate Justice of the Supreme Court of New Mexico, stated:

> In Los Alamos Credit Union, the lender inadvertently marked a note as paid and released the accompanying mortgage even though the note was not paid.  The borrowers refused the lender's request to reaffirm the note and to have the mortgage reinstated.  After the borrowers failed to make a payment due under the original note, the lender brought a foreclosure suit, alleging that the release was a clerical error.  The borrowers asserted that the lender could not avoid a properly executed, unambiguous release of the mortgage.  In upholding the trial court's grant of summary judgment in favor of the lender, we held that the borrowers failed to present evidence sufficient to create a genuine issue of fact denying the existence of the obligation and that therefore, summary judgment was appropriate.

> As in Los Alamos Credit Union, appellants in the instant case have failed to present a genuine issue of fact concerning the existence of the obligation.  Three letters exchanged among Curry County Grain, Sunwest, and Citizens Bank were introduced into evidence regarding satisfaction of the Curry County Grain debt and release of the debt and mortgages.   These letters indicated that the corporate debt was only partially satisfied.  Randy Harris, President of Sunwest, testified that the form that purportedly released the debt was used by mistake and that the intent in using the form was to release the mortgages and not the debt.  Testimony established that Michael Garrett continued to negotiate on behalf of Curry County Grain after the purported release was issued.   This evidence establishes that the Curry County Grain debt was only partially satisfied and that the mortgages, and not the underlying debt, were released.  Like the borrowers in Los Alamos Credit Union, appellants here have in effect asserted that an unambiguous release cannot be avoided.  Appellants have presented no evidence refuting the existence of the underlying corporate debt and thus, have not created an issue of fact.  The trial court did not err in granting a directed verdict on this issue.

Clovis, N.A. v. Garrett, 1992-NMSC-002, ¶¶ 10-11.  Thus, the Supreme Court of New Mexico

requires borrowers to demonstrate that the underlying debt no longer exists.

Far from demonstrating that the underlying debt no longer existed after the short sale, the

documents attached to the Amended Complaint show the opposite.  For example, the Letter

states, in pertinent part:

> Dear Mortgagor(s):
>
> Chase Home Finance LLC ("Chase") has agreed to your request for a Short Sale,
> and will accept a minimum of $104,880.58 to release the lien(s) on the above-
> referenced Property.
>
> **Please note this amount is for the release of the lien(s) only and that you are
> responsible for all deficiency balances per the terms of the original loan
> documents.**

Letter at 1 (bold in original).  Similarly, the First Release states, in pertinent part, that MERS

"does hereby discharge all of the real estate mentioned in said mortgage from the lien and

operation thereof."  First Release at 1.  The Second Release states, that MERS -- on behalf of

First Franklin -- "does hereby discharge all of the real estate mentioned in said mortgage from

the lien and operation thereof."  Second Release at 2.  Neither release indicates that JPMorgan

Chase released Vilar's underlying debt obligations on either the First Mortgage or the Second

Mortgage.

The closest Vilar comes to establishing a valid waiver is the Wire Transfer form, which

says under the "Memo" line: "Payoff first mortgage . . . short sale payoff loan 24723025."  Wire

Transfer at 1.  As Vilar has explained, the Second Mortgage was Loan #24723025.  See

Amended Complaint ¶ 21, at 5.  This single line does not establish a valid waiver, because there

is no indication in the Complaint as to who composed the document, wrote that specific line, or,

more importantly, whether JPMorgan Chase agreed to it or was even aware of it.  There are no

allegations in the Complaint that a JPMorgan Chase employee was present when this wire transfer was made.  The line itself is also ambiguous, because it indicates that the transfer's purpose is to "[p]ayoff [the] first mortgage" yet uses the loan number from the Second Mortgage. If the transfer's purpose was to pay off both loans, it should have stated "pay off First and Second Mortgage," or -- at the very least -- included both loan numbers.  Consequently, there are no reasonable inferences from that single line that JPMorgan Chase validly waived its right to collect the remainder of Vilar's debt on the Second Mortgage.

Vilar's other two arguments similarly do not indicate that JPMorgan Chase released Vilar's debt on the Second Mortgage.  First, Vilar points to the fact that the loan numbers for both the First and Second Mortgage were typed on the Purchase Agreement.  Including both numbers on the Purchase Agreement made sense, however, because the short sale extinguished both of JPMorgan Chase's liens that secured the First and Second Mortgage.  Second, Vilar asserts that JPMorgan Chase cannot simultaneously argue that the short sale extinguished its right to collect the remainder of Vilar's debt on the First Mortgage, but did not affect Vilar's debt on the Second Mortgage.  As an initial matter, there is no indication in the Amended Complaint that the short sale extinguished JPMorgan Chase's right to collect on the First Mortgage or that JP Morgan Chase did not pursue further collection on the First Mortgage after the short sale.  If JPMorgan Chase chose on its own to not to report Vilar's delinquency on the First Mortgage or to pursue further collection on it after the short sale, such de facto loan forgiveness on the First Mortgage would not have constituted an unambiguous waiver of its right to collect the remaining debt on the Second Mortgage.  Consequently, because JPMorgan Chase did not release Vilar's remaining debt on the Second Mortgage, it accurately reported to the CRAs that Vilar was

delinquent on that Mortgage.[16]  Because § 1681s-2(a) does not give rise to a private cause of action, and because Vilar's allegations would not constitute a violation of § 1681s-2(a) if such a private right existed, the Court will dismiss Vilar's claim against JPMorgan Chase for willfully violating § 1681s-2(a).

## II.   VILAR DOES NOT PLAUSIBLY ALLEGE THAT JPMORGAN CHASE NEGLIGENTLY VIOLATED § 1681i OF THE FCRA.

Vilar does not plausibly allege that JPMorgan Chase negligently violated § 1681i of the FCRA.  Section 1681i(a) provides, in relevant part:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i(a)(1)(A).  This section, by its express terms, limits the duty to conduct a reasonable investigation to consumer reporting agencies.  Moreover, the FCRA defines a "consumer reporting agency" as:

---

[16]Even analyzing the Letter as a possible novation indicates that Vilar had a continuing obligation to repay the Second Mortgage.  A Novation requires: "(1) an existing and valid contract, (2) an agreement to the new contract by all parties, (3) a new valid contract, and (4) an extinguishment of the old contract by the new one."  Sims v. Craig, 1981-NMSC-046, ¶ 6, 627 P.2d 875, 877 (N.M. 1981).  For a novation, "there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed."  Sims v. Craig, 1981-NMSC-046, ¶ 6 (citation omitted)(internal quotation marks omitted).

The Letter demonstrates Vilar's and JPMorgan Chase's "clear and definite intention" for JPMorgan Chase to release its liens on the Property in exchange for payment in the amount of the short sale.  Nowhere does it mention that Vilar's existing obligation under the Second Mortgage is discharged.  In fact, the Letter expressly states that the payment to JPMorgan Chase "is for the release of the lien(s) only and that [Vilar is] responsible for all deficiency balances per the terms of the original loan documents."  Letter at 1.  Accordingly, even if the Court analyzed the Letter as a possible novation, there is no indication that it discharged her pre-existing debt on the Second Mortgage and would constitute a novation.

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

There are no allegations in the Amended Complaint that JPMorgan Chase constitutes a "consumer reporting agency" under § 1681i. Vilar alleges that JPMorgan Chase is a "mortgage servicing company" that serviced the First and Second Mortgages. Amended Complaint ¶ 8, at 3; id. ¶ 13, at 4. These activities do not involve the assembly or evaluation of consumer credit information for the purpose of furnishing consumer reports to third parties. See 15 U.S.C. § 1681a(f). As such, Vilar's allegations do not raise the reasonable inference that JPMorgan Chase is a CRA. Consequently, the Court concludes that Vilar has failed to state a plausible claim that JPMorgan Chase violated § 1681i of the FCRA.

## III.   VILAR DOES NOT PLAUSIBLY ALLEGE THAT JPMORGAN CHASE VIOLATED § 57-12-2 OF THE UPA.

"The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (citing Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 22). "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22.

New Mexico law has established that a claim under the UPA has four elements:

> First, the complaining party must show that the party charged made an oral or written statement, visual description or other representation that was either false or misleading. Second, the false or misleading representation must have been knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or collection of debts. Third, the conduct complained of must have occurred in the regular course of the representer's trade

or commerce.  Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311 (N.M. 1991)(alterations omitted)(internal quotation marks omitted).  See Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶¶ 20-38, 166 P.3d 1091, 1093 (N.M. Ct. App. 2007)(applying the same elements in analyzing a UPA claim).  "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17.  Notably, a plaintiff need not prove detrimental reliance upon the defendant's representations to state a plausible UPA claim; the UPA permits recovery "even if the conduct only tends to deceive."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35 (internal quotation marks omitted).  Section 57-12-2(D) also provides examples of conduct that could violate the UPA, including "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D)(14).  Vilar contends that JPMorgan Chase violated the UPA in two ways.  First, Vilar asserts that JPMorgan fraudulently accepted the short-sale's proceeds to release the Second Mortgage, which it had already sold to a debt collector.  Second, Vilar contends that, even if JPMorgan Chase still owned the Second Mortgage when it negotiated the short sale and received the short-sale's proceeds, it failed to disclose material information in the Letter.  The Court concludes that neither of these allegations asserts a plausible UPA claim.

A.   **VILAR'S     ALLEGATIONS     THAT     JPMORGAN     CHASE FRAUDULENTLY ACCEPTED THE SHORT-SALE'S PROCEEDS TO RELEASE A MORTGAGE THAT IT NO LONGER OWNED DO NOT STATE A PLAUSIBLE CLAIM UNDER § 57-12-2 OF THE UPA.**

Vilar's allegations that JPMorgan Chase fraudulently accepted the short-sale's proceeds to release the Second Mortgage do not state a plausible claim under § 57-12-2 of the UPA.  The Amended Complaint alleges:

> Defendant Chase engaged in unfair, deceptive and unconscionable trade practices as set for[th] in NMSA § 57-12-2(E) in connection with the collection of a debt when it:
>
> A.   Charged-off and sold Plaintiff's second Mortgage to a collection agency in December 2010, then, two months later, negotiated and accepted payment from a short sale on Plaintiff's property;
>
> B.   Ignored the fact that the lender, first Franklin, had recorded releases of both the first and second Mortgages on Plaintiff's property less than two months later;
>
> C.   Sold the charged-off debt of Plaintiff's second Mortgage to a collection agency;
>
> D.   After not reporting on this debt for over a year, began reporting Plaintiff's second Mortgage as more than 90 days delinquent, and continued to do so for fourteen months;
>
> E.   Continued to verify the debt for the credit reporting agencies every time Plaintiff filed a dispute, despite the fact that Chase no longer owned the debt.

Amended Complaint ¶ 68, at 13.  In short, Vilar seems to allege that JPMorgan Chase violated the UPA by misrepresenting that it still owned the Second Mortgage when it: (i) negotiated the short sale; (ii) accepted the short-sale's proceeds; and (iii) confirmed Vilar's delinquency on the Second Mortgage when the CRAs investigated Vilar's disputes.

The remainder of the Amended Complaint and the documents attached to it contradict these allegations.  First, the Amended Complaint states:  "Chase has never released either the

first or the second Mortgage."  Amended Complaint ¶ 33, at 5.  If JPMorgan Chase has never released the Second Mortgage, it could not have misrepresented that it still owned the Second Mortgage at any time.  Second, the Amended Complaint alleges:  "In December 2010, Chase charged off Plaintiff's second Mortgage account, and wrote off the total balance due of $39,603.  Chase began reporting to credit bureaus that the debt had been '[t]ransferred to recovery.'"  Amended Complaint ¶ 16, at 4.  Although the Amended Complaint does not define either "charge off" or "write off," every definition that the Court has found is consistent with that of the Honorable Robert C. Jones, United States District Judge for the District of Nevada: "Writing off bad debt does not affect the fact or timing of a delinquency.  A bank may write off bad debt for accounting purposes after 120 days while still reporting (accurately) that a debt is in fact more than 120 days overdue.  In fact, such debt is still enforceable."  Dye v. TransUnion, LLC, No. CIV 13-01094 RCJ, 2013 WL 5663094, at *3 (D. Nev. Oct. 15, 2013)(emphasis added).  The Amended Complaint's allegations that JPMorgan Chase "charged off," "wrote off," and "transferred [the Second Mortgage] to recovery" illustrates that JPMorgan Chase never sold its rights to collect on the Second Mortgage, but -- at most -- hired a debt collection agency to obtain the remaining amount that Vilar still owed on the Second Mortgage.

Third, fitting this alleged sale into the timeline that the Amended Complaint sets forth demonstrates that such a sale is implausible.  Vilar contends that JP Morgan Chase sold the Second Mortgage to an unknown debt collection agency in December, 2010.  See Amended Complaint ¶ 68, at 13.  Then, according to Vilar, on February 1, 2011, JPMorgan Chase fraudulently agreed to release the Second Lien in exchange for the proceeds from the short sale.  See Letter at 1.  Vilar alleges that, on February 28, 2011, JPMorgan Chase fraudulently accepted over a hundred thousand dollars to release a lien that it did not own.  See Wire Transfer at 1.

- 43 -

Vilar asserts that, on March 30, 2011, First Franklin released the First Lien on behalf of JPMorgan Chase.  See First Release at 1.  Then, Vilar contends, five days later -- seemingly out of the blue -- First Franklin released the Second Lien -- which now belonged to the anonymous debt collection agency to whom JPMorgan Chase had sold the Second Mortgage.  Moreover, Vilar alleges that, throughout, JPMorgan Chase fraudulently continued to verify Vilar's delinquency on the Second Mortgage to CRAs every time Vilar filed a dispute for no discernible reason.  See Amended Complaint ¶ 68, at 13.  Although such a chain of events is conceivable, it is implausible that, if Vilar had any basis to assert that JPMorgan Chase stole over a hundred thousand dollars from her, she would allege only a UPA claim and do it in such a confusing and contradictory fashion.  That Vilar admits she has no evidence to support such a contention further reinforces this conclusion.  See Tr. at 22:11-23:2 (Court, Shafer).[17]

The Tenth Circuit has cautioned that "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the

---

[17]The following exchange occurred at the November 13, 2014, Hearing:

| THE COURT: | Is there any evidence that [JPMorgan Chase] is not the owner of both notes? |
| --- | --- |
| MS. SHAFER: | It's questionable, Your Honor. . . .  Counsel for Real Time and I . . . went back and forth informally, and I asked her -- she said the notes still belong to Chase when it went to Real Time; just transferred collection rights. |
| | And I said, "Can you show me anything that indicates that?"  And she couldn't.  She produced one line of computer letters and numbers that she said showed that, but neither one of us understood it, and we admitted that to one another.  And so I have yet to see a contract between Real Time and Chase which shows that it was a transfer of collection rights versus a sale. |

Tr. at 22:11-23:2 (Court, Shafer).

complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).  Moreover, for purposes of a motion to dismiss, "the terms of the documents sued upon and referenced in the complaint are controlling and must be considered over any contradictory allegations in the complaint . . . ." Indulgence Yacht Charters, Ltd. v. Ardell, Inc., No. CIV 08-60739, 2008 WL 4346749, at *4 (S.D. Fla. Sep. 16, 2008).  Thus, "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint.  If the appended document . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." Pedraza v. Coca-Cola Co., 456 F. Supp. 2d 1262, 1269 (N.D. Ga. 2006)(quoting Assoc. Builders, Inc. v. Ala. Power Co., 505 F. 2d 97, 100 (5th Cir. 1974)) abrogated on other grounds by Lanfear v. Home Depot, Inc., 679 F.3d 1267, 1280 (11th Cir. 2012).  The Court concludes that Vilar's claims reach beyond the realm of plausibility into the fanciful.  Although there is certainly a "metaphysical possibility" that JPMorgan Chase sold the Second Mortgage and then orchestrated a fraudulent transaction to obtain the short sale's proceeds, Vilar has not "nudged [her] claim[] across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. at 546.

The following scenario is plausible based on the facts that the Amended Complaint alleges and the documents attached to the Amended Complaint.  First Franklin originated the First and Second Liens and First and Second Mortgages in June, 2007.  See Amended Complaint ¶ 12, at 3.  Three or four months later, First Franklin sold the mortgages to JPMorgan Chase. See Amended Complaint, ¶ 13, at 4.  Vilar became delinquent on the Second Mortgage in January, 2009.  See Amended Complaint ¶ 13, at 4.  In December, 2010, JPMorgan Chase hired

a debt collector to obtain the delinquent amount on the Second Mortgage.  See Amended Complaint ¶ 16, at 4 ("Chase began reporting to the credit bureaus that the debt had been '[t]ransferred to recovery.'").  JPMorgan Chase consented to Vilar putting the Property on the market as a short sale.  See Amended Complaint ¶ 15, at 4.  On January 18, 2011, Vilar accepted an offer to purchase the Property as a short sale.  See Amended Complaint ¶ 17, at 4.  On February 1, 2011, JPMorgan Chase approved the short sale for $104,880.58 and agreed to "release the lien(s)" on the property "[o]nce certified funds have been received."  Amended Complaint ¶ 18, at 4 (quoting Letter at 1).  On February 28, 2011, JPMorgan Chase accepted the wire transfer with the short sale's proceeds.  See Wire Transfer at 1.  On March 30, 2011, First Franklin -- from whom JPMorgan Chase had purchased the mortgages and notes -- released the First Mortgage.  See First Release at 1.  On April 4, 2011, First Franklin released the Second Mortgage on behalf of the anonymous debt collection agency to whom JPMorgan Chase had sold the Second Mortgage.  See Second Release at 1.

The point at which Vilar's version diverges from the Court's is that JPMorgan Chase sold the Second Mortgage to a debt collector in December, 2010.  See Amended Complaint ¶ 68, at 13.  There is nothing in the Amended Complaint or the documents attached to it to support that contention.  Vilar admits that she has no evidence to support her contention that JPMorgan Chase sold the Second Mortgage and, thus, the deck of cards upon which her UPA claim is based falls.  Consequently, the Amended Complaint fails to plausibly allege that JPMorgan Chase violated the UPA.[18]

---

[18]The crux of Vilar's UPA claim is that JPMorgan Chase sold the Second Mortgage before it negotiated the short sale of the Property and accepted the short-sale's proceeds.  As the Court as explained, the Amended Complaint's allegations and the documents attached to the Amended Complaint make such a contention implausible.  Moreover, Vilar admits she has no evidence that such a sale occurred.  If Vilar obtains such evidence during discovery, however,

**B.   VILAR'S ALLEGATION THAT JPMORGAN CHASE'S FAILURE TO TELL HER THAT THE SHORT SALE DID NOT EXTINGUISH HER DEBT OBLIGATIONS DOES NOT STATE A PLAUSIBLE CLAIM UNDER § 57-12-2 OF THE UPA.**

Perhaps anticipating the Court's skepticism of her primary argument on the UPA claim, Vilar asserted that, even if JPMorgan Chase did not sell the Second Mortgage, the ambiguity of the Letter, the Wire Transfer, and the Purchase Agreement, in addition to the local custom in New Mexico -- under which lenders have a difficult time enforcing deficiency judgments -- led her to believe that the short sale satisfied her debt obligations on both the First and Second Mortgage.   See Tr. at 9:9-12:18 (Shafer).   In Vilar's view, because of these ambiguities, JPMorgan Chase had a responsibility to inform her that: (i) the short sale did not completely discharge her debt; (ii) the exact amount that she owed; (iii) her monthly payment amounts; and (iv) where she should send her payments.   See Tr. at 11:1-12 (Shafer).   The Court disagrees for two reasons.

First, far from being ambiguous, the documents attached to the Amended Complaint clearly state that JPMorgan Chase did not discharge Vilar's debt on the Second Mortgage.   For example, the Letter states, in pertinent part:

> Dear Mortgagor(s):
>
> Chase Home Finance LLC ("Chase") has agreed to your request for a Short Sale, and will accept a minimum of $104,880.58 to release the lien(s) on the above-referenced Property.
>
> **Please note this amount is for the release of the lien(s) only and that you are responsible for all deficiency balances per the terms of the original loan documents.**

Letter at 1 (bold in original).   Loan documents are often overwhelming -- even for lawyers. They often take up dozens of pages, use legalese, and have pertinent provisions in small font.

she may move to bring JPMorgan Chase back into the case and to include those allegations.

The Letter does none of those things.  It is neither long nor complicated.  As far as the Court can tell, it is only two pages, written clearly and in plain English.  The relevant provision -- which states that the short sale's proceeds only release the liens on the Property and do not extinguish Vilar's remaining debt obligations -- also was not hidden or concealed in any way.  Instead, it was placed in the second paragraph in the middle of the first page in normal-size font and bolded.  Moreover, nothing in the remainder of the letter contradicts that provision.  The Letter's clarity indicates that Vilar had every reasonable opportunity to learn that the short sale did not extinguish her debt obligations.  Moreover, as the Court has already addressed, that the other documents attached to the Amended Complaint included the loan numbers for both the First and Second Mortgages -- especially in light of the Letter's clear language -- do not indicate that the short sale extinguished her debt, but instead only show that the short sale applied to the liens on both of those mortgages.

Second, any local custom of state court judges refusing to enforce deficiency judgments did not trigger any additional disclosure obligations.  As an initial matter, the Court notes that the Amended Complaint does not contain any allegations that such a custom or practice exists in New Mexico, or that Vilar relied on such a practice in agreeing to the short sale.  Instead, Vilar raised this argument for the first time at the hearing.  The Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d at 1236.  There are three limited exceptions to this general principle -- none of which apply here.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 (setting forth the three exceptions: (i) documents that the complaint incorporates by reference;

(ii) documents referenced in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (iii) matters of which a court may take judicial notice).   For the sake of completeness, however, the Court will consider the purported local practice in its UPA analysis.

Even if there were such a practice, it would be inapposite for two reasons.  First, Vilar does not contend that state court judges refuse to enforce deficiency judgments because lenders have no right to collect on them.  Instead, Vilar seems to argue that this alleged practice creates an affirmative right for her to refuse to pay her debt unless JPMorgan Chase informs her otherwise.  This argument lacks a sound basis in logic, reason, and the law.  That some have chosen not to enforce the law in certain situations does not grant an affirmative right to everyone to break the law in every situation unless someone informs them that they cannot do so.  Second, Vilar does not cite -- and the Court has been unable to find -- a case in which a local custom or practice of refusing to enforce a law requires lenders to disclose that they expect borrowers to follow the law.  The lack of such a holding makes sense, because to hold otherwise would require lenders to state in all of its correspondence with borrowers which federal and local laws potentially apply and explain that they intend to enforce their rights.  Regardless of a purported local practice, both borrowers and lenders should assume that, unless otherwise stated, all relevant state and local laws apply in every transaction.  Consequently, JPMorgan Chase did not violate the UPA for failing to take into consideration New Mexico state courts' alleged refusal to enforce the law.

Third, any information that JPMorgan Chase omitted from the Letter was immaterial, because Vilar was already aware of it.  "The UPA . . . imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading."  Smoot v. Physicians

Life Ins. Co., 2004-NMCA-027, ¶ 15, 87 P.3d 545, 549 (N.M. Ct. App. 2004)(citing N.M. Stat. Ann. § 57-12-2(D)).  New Mexico court have held that information is material where: (i) the plaintiff has no reasonable opportunity to ascertain it; and (ii) whether it would have induced a reasonable consumer in the plaintiff's shoes to enter into that contract.

In Azar v. Prudential Insurance Company of America, for example, insurance policyholders alleged that Prudential Insurance violated the UPA by failing to disclose the additional cost of paying their insurance premiums in monthly rather than annual installments. See 2003-NMCA-063, ¶ 1.  The Court of Appeals of New Mexico, in an opinion that the Honorable Cynthia A. Fry, Judge for the Court of Appeals of New Mexico, wrote, stated that Prudential Insurance's omissions

> were material if they would have induced a reasonable consumer in Plaintiffs' shoes to enter into the insurance contracts or to select a particular payment mode . . . and whether Plaintiffs had no reasonable opportunity to ascertain the significance of those payment modes.

Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 73.  Applying this materiality test, Judge Fry cited the testimony of two "business experts":

> Professor Beth, in his affidavit, explained why modal premium charges should be disclosed to both the policyholder and the prospective policyholder in terms of both dollars and an APR, similar to the disclosures required under TILA in consumer credit transactions.  He stated that, in his opinion, "these are the essential material pieces of information the policyholder must have in order to make an informed decision about the premium payment frequency option that is most appropriate or advantageous in the light of his or her financial circumstances."  He pointed out that modal premium charges affect a large majority of policyholders who pay their premiums more often than annually.  He stated that modal premium charges should be disclosed, not only in dollars, but as an APR so that the consumer can make an informed choice about how best to pay for the annual premium, whether from a savings account or other investment, or by taking out a loan or charging to a credit card with a lower APR.  He also stated that APR disclosures would allow the consumer to more easily compare the difference in charges among the various insurance companies.  Finally, he explained that the failure to disclose an APR tends to deceive consumers by leaving the impression that the APR is lower than it actually is. . . .

> In his affidavit, Dr. McDonald indicated that he reviewed each of the policies in this case and calculated both the dollar amount differences and the APR for each of the policies. . . .  [H]e opined that it is "extremely difficult to calculate, or even approximate, the applicable APR" for the various payment options, noting that "it is necessary to have a calculator or spreadsheet computer program which is specially programmed for the purpose of calculating APRs," and even then the person must know how to operate the calculator or computer.

Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶¶ 75-76.  Based on this testimony, Judge Fry concluded that there was a triable issue of fact whether the difference between monthly and annual payments was material.  See Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 81.

The Court of Appeals faced a similar issue in Smoot v. Physicians Life Insurance Co., 2004-NMCA-027, 87 P.3d 545 (N.M. Ct. App. 2003).  In that case, as in Azar v. Prudential Insurance Co. of America, the plaintiff was an insurance policyholder alleging that her insurance company violated the UPA when it failed to disclose the difference between paying her insurance premiums on a monthly, rather than annual, basis.  See 2004-NMCA-027, ¶¶ 3-4.  In an opinion that the Honorable Celia F. Castillo, Judge for the Court of Appeals of New Mexico, wrote, the Court of Appeals of New Mexico stated

> The UPA . . . imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading.  Sections 57-12-2(D) and 59A-16-4(G).  The existence of a duty is dependent on the materiality of the facts.  Azar, 2003-NMCA-062, ¶ 64, 133 N.M. 669, 68 P.3d 909. . . .  Defendant argues that consumers are certainly capable of calculating the cost of insurance based on the raw data provided on the policy.  The cases cited by Defendant essentially deal with the issue of materiality; in this case, Plaintiff has alleged that the charges were material facts.  This Court takes all well-pled facts as true.  Vigil v. Arzola, 101 N.M. 687, 688, 687 P.2d 1038, 1039 (1984).  Under these circumstances, Plaintiff adequately alleged sufficient facts to assert a claim that Defendant breached its statutory duty under the UPA . . . .

Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 15.

Finally, in Nakashima v. State Farm Mutual Automobile Insurance Co., 2007-NMCA-027, 153 P.3d 664 (N.M. Ct. App. 2007), the plaintiff -- Laura Nakashima -- alleged that her

insurance company -- State Farm Mutual Automobile Insurance Co. -- violated the UPA by failing to disclose an additional charge for paying her insurance premiums in monthly installments.  See 2007-NMCA-027, ¶ 4.  Although the information was not included in her monthly premium form, it was clearly stated in the form that she signed when she enrolled in the monthly payment plan.  See 2007-NMCA-027, ¶ 4.  The Court of Appeals of New Mexico, in an opinion that the Honorable Lynn Pickard, Judge for the Court of Appeals of New Mexico, wrote, held that Nakashima had not stated a valid UPA claim.  See 2007-NMCA-027, ¶¶ 32-34.  Judge Pickard explained that, unlike in Azar v. Prudential Insurance Co. of America and Smoot v. Physicians Life Insurance Co. -- which both involved suits dealing with a failure to disclose material facts relating to insurance premium payment options -- Nakashima did not allege that she was not aware of the installment fees or that State Farm failed to disclose such fees to her. See 2007-NMCA-027, ¶ 33.  Instead, Judge Pickard stated: "Plaintiff's only complaint is that such fees were not stated on the policy itself."  2007-NMCA-027, ¶ 33.  Because State Farm had previously disclosed the information that Nakashima said was material, Judge Pickard held that the UPA did not require it to do so again in the policy itself.  See 2007-NMCA-027, ¶ 33.

The facts of this case are more similar to Nakashima v. State Farm Mutual Automobile Insurance Co. than Azar v. Prudential Insurance Co. of America and Smoot v. Physicians Life Insurance Co.  Unlike in Azar v. Prudential Insurance Co. of America and Smoot v. Physicians Life Insurance Co., where the plaintiffs had no reasonable opportunity to ascertain that it would be less expensive to pay their insurance premiums annually, because the insurance companies never informed the plaintiffs of the difference, Vilar has not alleged that she had no opportunity to learn: (i) the short sale did not completely discharge her debt; (ii) the exact amount that she owed; (iii) that she should continue to make the same monthly payments; and (iv) where she

should send her payments.  Indeed, Vilar has not alleged that she was unaware of any of these facts.  Instead, she alleges that the omission of those details from the Letter, the Wire Transfer, and the Purchase Agreement led her to believe that the short sale had satisfied her debt obligations on both the First and Second Mortgage.

Like in Nakashima v. State Farm Mutual Insurance Co., whose allegations focused on State Farm's failure to include the key information in her premium, Vilar's allegations focus on JPMorgan Chase's failure to include all of this information in the Letter.  See Nakashima v. State Farm Mut. Ins. Co., 2007-NMCA-027, ¶¶ 32-34.  As the Court of Appeals of New Mexico held in Nakashima v. State Farm Mutual Insurance Company, such an omission on a single document is immaterial, because it had already been disclosed.   See 2007-NMCA-027, ¶ 33. Such a distinction makes sense.  It would not be wise public policy to hold companies responsible for failing to disclose material facts on every single piece of correspondence they send to their customers where they have already disclosed that information on other documents.   That approach would not only be burdensome on companies, but would also overwhelm consumers with information -- inundating their inboxes and mailboxes with every term of their prior agreements.   The UPA prohibits only misleading, false, or deceitful statements and material omissions.  On the other hand, it is not like the Securities Act that require full disclosure or that some specific information should be included in a company's correspondence.  As the UPA does not provide for such disclosures and New Mexico courts have not enforced them, the Court will not do so here.  Consequently, even if the omitted information was material, Vilar has failed to state a plausible claim that JPMorgan Chase violated the UPA.

## IV.  VILAR DOES NOT PLAUSIBLY ALLEGE THAT JPMORGAN CHASE VIOLATED EITHER § 1692g(a) OR § 1692e(2)(A) OF THE FDCPA.

Vilar does not plausibly allege that JPMorgan Chase violated §§ 1692g(a) or 1692e(2)(A)

of the FDCPA.  Section 1692g(a) of the FDCPA provides:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing --
>
> **(1)**    the amount of the debt;
>
> **(2)**    the name of the creditor to whom the debt is owed;
>
> **(3)**    a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> **(4)**    a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>
> **(5)**    a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).  Similarly, § 1692e(2)(A) states, in pertinent part: "A debt collector may

not . . . make a "false representation of . . . the character, amount, or legal status of any debt."  15

U.S.C. § 1692e(2)(A).  The FDCPA defines a "debt collector," in pertinent part, as

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.  Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own

- 54 -

which would indicate that a third person is collecting or attempting to collect such debts. . . .   The term does not include --

. . . .

(F)     any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C. § 1692a(6)(F).

Because Vilar has not alleged that JPMorgan Chase is a "debt collector" under § 1692a(6)(F), she cannot plausibly state a claim that JPMorgan Chase violated either § 1692g(a) or § 1692e(2)(a) of the FDCPA.  Vilar alleges that First Franklin originated the First and Second Notes and the First and Second Mortgages in June, 2007.  See Amended Complaint ¶ 12, at 3. Vilar states that First Franklin transferred the First and Second Notes, and the First and Second Mortgages to JPMorgan Chase three or four months later.  See Amended Complaint ¶¶ 12-13. Vilar also says that she did not default on the Second Mortgage until January, 2009.  See Amended Complaint ¶ 14, at 4.  Because the loans were "not in default at the time [they were] obtained by" JPMorgan Chase, 15 U.S.C. § 1692a(6)(F)(iii),   Vilar's allegations indicate, therefore, that JPMorgan Chase was not a debt collector under the FDCPA.  Because Vilar does not allege that JPMorgan Chase ever used a different name to collect its debt, JPMorgan also is not a debt collector under § 1692a(6)(F)'s exception to § 1692a(6)(F)(iii) -- i.e., "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts."   15 U.S.C.

§ 1692a(6)(F).  The Court will, accordingly, dismiss the claims against JPMorgan Chase brought

under the FDCPA.

**IT IS ORDERED** that JP Morgan Chase Bank, N.A.'s Motion to Dismiss for Failure to

State a Claim, filed July 14, 2014 (Doc. 62), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

B. Kay Shafer
Law Office of B. Kay Shafer
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Patricia Williams
Wiggins, Williams & Wiggins
Albuquerque, New Mexico

--and--

Kendall Carter
King & Spalding, LLP
Atlanta, Georgia

    *Attorneys for Defendant Equifax Information Services, LLC*

Rodney L. Schlagel
Bobbie Jo Collins
Butt, Thornton & Baehr
Albuquerque, New Mexico

--and—

Ginny Webb
Strasburger & Price, LLP
Frisco, Texas

    *Attorneys for Defendant Transunion, LLC*

Charles J. Vigil
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Alexandra Fries
Rana Nader
Jones Day
Irvine, California

     *Attorneys for Defendant Experian Information Solutions, Inc.*

Jason C. Bousliman
Lewis Roca Rothgerber
Albuquerque, New Mexico

--and--

Matthew W. Park
Lewis Roca Rothgerber
Las Vegas, New Mexico

     *Attorneys for Defendant JPMorgan Chase, N.A.*

Bryan Wade Thomason
Thomason Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant LCS Financial Services Corporation*

R. Ruben Gallegos
Gallegos Law Firm
Albuquerque, New Mexico

     *Attorneys for Defendant RCS Recovery Services*

Diane P. Donaghy
Tijeras, New Mexico

     *Attorney for Defendant Real Time Resolutions, Inc.*